**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NICHOLAS GAMBO, | |
| *Plaintiff*, | |
| v. | Civil Action No. 22-1726 (RDM) |
| LYFT, INC., *et al.*, | |
| *Defendants*. | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff Nicholas Gambo alleges that he rented a Lyft scooter using the Lyft application on his cellphone and, while riding the scooter, the stem detached from the deck, causing Gambo to fall and seriously injury himself.  Dkt. 1-1 at 12–13.  Gambo filed this action in the Superior Court for the District of Columbia in May 2022 against Lyft, Inc., Lyft Bikes and Scooters, LLC, Segway Inc., Segway Robotics Inc., Ninebot Inc., and Xiaomi USA LLC.  Dkt. 1-1 at 7–8. Shortly thereafter, Lyft, Inc. and Lyft Bikes and Scooters, LLC (collectively, "Lyft") removed the action to this Court, Dkt. 1 at 3, and Lyft then moved to compel arbitration and to dismiss Plaintiff's claims against it or to stay proceedings pending arbitration.  Dkt. 17 at 1–2.  Plaintiff opposes that motion.  Dkt. 25 at 1.

For the following reasons, the Court will **GRANT** Lyft's motion, will **COMPEL** arbitration, and will **STAY** Plaintiff's claims against Lyft pending further order of the Court.

## I. BACKGROUND

Lyft, Inc. "operates a mobile device-based software platform that allows users," among other things, "to rent electric scooters."  Dkt. 17-2 at 3 (McGowan Decl. ¶ 5).  According to the Declaration of Ryan McGowan, a staff engineer at Lyft, Nicholas Gambo first created a Lyft

account on January 15, 2018.  *Id.* at 4–5 (McGowan Decl. ¶ 15).  "Users who created a Lyft

account on or about January 15, 2018, like Plaintiff Nicholas Gambo, were presented with a

screen with a checkbox seeking assent to the statement 'I understand and agree to Lyft's Terms

of Service and Privacy Policy."  *Id.* at 5 (McGowan Decl. ¶ 16).  The McGowan Declaration

include the following image, which "depicts what a user would likely have seen on her/his screen

when creating an account on or about January 15, 2018."  *Id.*



As the photograph shows, the words "Terms of Service and Privacy Policy" were written

in bright pink and included a hyperlink "to the September 30, 2016 Lyft Terms of Service

Agreement that was in effect at the time; users had the opportunity to scroll through and review

those Terms of Service." *Id.* at 6 (McGowan Decl. ¶ 17).  And, "[i]n order to click 'Next' and proceed to use the Lyft App and the Lyft Platform, users were required to check the checkbox." *Id.* at 6 (McGowan Decl. ¶ 18).  This type of electronic agreement is known as a "clickwrap" agreement, Dkt. 17-1 at 7—that is, an agreement "in which an internet user accepts a website's terms of use by clicking an 'I agree' or 'I accept' button, with a link to the agreement readily available," *Seldon v. Airbnb, Inc.*, 2016 WL 6476934, at *4 (D.D.C. Nov. 1, 2016), *aff'd*, 4 F.4ᵗʰ 148 (D.C. Cir. 2021).  Here, the user was required to click on a box representing that he understood and agreed to the Terms of Service, and those Terms of Service were accessible by merely clicking on the highlighted link appearing in that same sentence.  "Because all scooter rentals must be made through the Lyft App, this registration process means that users could not rent a Lyft scooter without first downloading the Lyft App and accepting the Terms of Service Agreement."  Dkt. 17-2 at 6. (McGowan Decl. ¶ 19).

The very first page of the September 30, 2016 Lyft Terms of Service, in turn, stated that "[t]hese terms of service constitute a legally binding agreement . . . between you and Lyft, Inc. . . . governing your use of the Lyft application, website, and technology platform."  Dkt. 17-3 at 2.  Immediately below that clause, the Terms of Service advised users as follows:

> THIS AGREEMENT CONTAINS PROVISIONS THAT GOVERN HOW CLAIMS YOU AND LYFT HAVE AGAINST EACH OTHER CAN BE BROUGHT (SEE SECTION 17 BELOW).  THERE PROVISIONS WILL, WITH LMITED EXCEPTION, REQUIRE YOU TO SUBMIT CLAIMS YOU HAVE AGAINST LYFT TO BINDING AND FINAL ARBITRATION ON AN INDIVIDUAL BASIS, NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY CLASS, GROUP OR REPRESENTATIVE ACTION OR PROCEEEDING, AS A DRIVER, OU HAVE AN OPPORTUNITY TO OPT OUT OF ARBITRATION WITH RESPECT TO CERTAIN CLAIMS AS PROVIDED IN SECTIN 17.

*Id.*  The phrase "SEE SECTION 17 BELOW" appears in bright pink and is hyperlinked to the section of the Terms of Service containing the arbitration provisions.  Dkt. 17-1 at 9; Dkt. 17-3 at 2, 13–14.

Section 17, which is captioned "Dispute Resolution and Arbitration Agreement," explains that the user "AND LYFT MUTUALLY AGREE TO WAIVE [THEIR] RESPECTIVE RIGHTS TO RESOLUTION OF DISPUTES IN A COURT OF LAW BY A JUDGE OR JURY AND AGREE TO RESOLVE ANY DISPUTE BY ARBITRATION" and that "[e]xcept as expressly provided . . . ALL DISPUTES AND CLAIMS BETWEEN" the parties "SHALL BE EXCLUSIVELY RESOLVED BY BINDING ARBITRATION."  *Id.* at 13-14.  Among an array of other types of claims, this includes claims relating to "the Lyft Platform, the Services, any other goods or services made available through the Lyft Platform" and all "federal and state statutory and common law claims."  *Id.* at 14.  The arbitration clause delegates authority to "the arbitrator" to resolve "[a]ll disputes concerning the arbitrability of a Claim (including disputes about the scope, applicability, enforceability, revocability or validity of the Arbitration Agreement)."  *Id.* at 14.  Although the arbitration clause contains certain exceptions, *id.* at 17–18, none applies here.  Finally, the arbitration clause provides that "[t]his agreement to arbitrate . . . is governed by the Federal Arbitration Act and survives after the Agreement terminates or your relationship with Lyft ends."  *Id.* at 14.

According to the McGowan Declaration, "[a]fter accepting the September 30, 2016 version of the Terms of Service, Plaintiff Gambo used the Lyft Platform to rent scooters on 54 separate occasions."  Dkt. 17-2 at 6 (McGowan Decl. ¶ 20).  Plaintiff alleges that on one of these occasions, at approximately 4:14 a.m. on May 22, 2019, he "rented a Lyft Scooter [using] his phone application and . . . was riding [it] on K Street, SW, at or near its intersection with 3rd

Street, SW, in Washington, D.C."  Dkt. 1-1 at 12 (Compl. ¶ 14).  He maintains that "[s]uddenly and without warning, and while [he was] exercising due care and caution for his safety, . . . the stem of the [s]cooter instantaneously separated from the deck, causing [him] to fall forward, resulting in his face and head striking the ground and causing significant injury to his person." *Id.* at 12–13 (Compl. ¶ 18).

On May 17, 2022, before filing this lawsuit, Plaintiff agreed to a revised version of Lyft's Terms of Service, dated April 1, 2021.  Dkt. 17-2 at 8 (McGowan Decl. ¶ 26).  Like the 2016 Terms of Service, the 2021 version notifies users that the "Terms of Service constitute a legally binding agreement" between the user and Lyft.  *Id.* at 7 (McGowan Decl. ¶ 23).  And, like the 2016 Terms of Service, the 2021 Terms of Service includes language on the first page of the agreement highlighting the arbitration clause, *id.*; *see also* Dkt. 17-4 at 2 (April 1, 2021 Terms of Service), and, then, later in the agreement, includes a detailed arbitration clause, Dkt. 17-4 at 17-24.  Unlike the 2016 Terms of Service, however, the 2021 Terms of Service is offered as a "scrollwrap" agreement, *see* Dkt. 17-1 at 10—that is, an agreement that "is like a 'clickwrap,' but [where] the user is presented with the entire agreement," which the user can scroll through, and an "I Agree" button to click on to indicate the user's assent, *Selden*, 2106 WL 6476934, at *4.  The following image depicts the screen as it would initially appear, including the reference and hyperlink to the arbitration clause, as it appears on the first page:



Dkt. 17-2 at 7 (McGowan Decl. ¶ 23).

In May 2022, Plaintiff initiated this action in the Superior Court of the District of Columbia against Lyft, Inc. and Lyft Bikes and Scooters, LLC, as well as Segway, Inc., Segway Robotics, Inc., Ninebot, Inc. and Xiaomi USA, LLC.[1]  Dkt. 1 at 3; Dkt. 1-1 at 7-8.  Plaintiff asserts the following claims for negligence, *id.* at 13–39 (Compl. ¶¶ 22–105); product liability, defects in design and manufacture, *id.* at 39–54 (Compl. ¶¶ 107–204); strict liability negligent design and manufacture, *id.* at 54–71 (Compl. ¶¶ 205–295); and breach of implied warranty, *id.* at 71–84 (Compl. ¶¶ 296–365).  According to the Complaint, at all relevant time, Defendants

---

[1]  The parties have stipulated to the dismissal of Defendant Xiaomi USA, LLC from this case without prejudice.  *See* Dkt. 15; Min. Order (07/07/2022).

"owed a continuing duty of care to Plaintiff Gambo, to inspect, maintain, repair, monitor, service, design, and/or manufacture its scooters, including" by ensuing that such scooters "were in a reasonably safe condition for use by members of the public, with due care and regard for dangerous conditions that pose a risk of harm to persons lawfully riding" them. *Id.* at 12 (Compl. ¶ 15). Invoking the Court's diversity jurisdiction, the Lyft Defendants removed the case to this Court pursuant to 28 U.S.C. §§ 1332, 1441, and 1446. Dkt. 1 at 3–6.

Lyft now moves to compel arbitration and to dismiss all claims against it or, in the alternative, to stay the action as against it pending the conclusion of arbitration. Dkt. 17 at 1–5. Lyft argues that before riding the scooter, Plaintiff created a user profile and electronically consented to the 2016 Terms of Service, and before filing this lawsuit, consented to the 2021 Terms of Service, both of which require the parties to resolve their disputes through binding arbitration. Dkt. 17-1 at 6. In response, Plaintiff argues that "it cannot be said that [his] acceptance of the September 30, 2016, Lyft Terms of Service put him on reasonable notice that he was agreeing to forego his judicial rights in exchange for forced arbitration," Dkt. 25 at 4, and that the 2021 Terms of Service do not apply retroactively, *id.* at 6.[2]

## II. LEGAL STANDARD

The Court must evaluate Lyft's motion to compel arbitration "as if it were a request for summary disposition of the issue of whether or not there had been a meeting of the minds on the agreement to arbitrate." *Aliron Int'l, Inc. v. Cherokee Nation Indus., Inc.*, 531 F.3d 863, 865 (D.C. Cir. 2008) (cleaned up). "Although a motion to compel arbitration is similar to a motion for summary judgment in framing the burden of proof, the two motions are of course not

---

[2] After Lyft Defendants filed its motion, all parties requested that the Court stay the Rule 26(f) deadlines pending its decision, and the Court granted that request. Dkt. 18 at 1; Min. Order (07/18/2022). An order addressing next steps will issue separately.

identical." *Jin v. Parsons Corp.*, 966 F.3d 821, 827 (D.C. Cir. 2020).  Most notably, the Court "cannot postpone deciding the question of arbitrability *vel non* and allow the case to proceed on the merits," but rather must consider arbitrability at the outset of litigation.  *Id.*

"Because the party seeking to enforce an arbitration agreement bears the burden of proving that the other party agreed to arbitrate, the party seeking to compel arbitration must first present evidence sufficient to demonstrate an enforceable agreement to arbitrate." *Osvatics v. Lyft, Inc*., 535 F. Supp. 3d 1, 9 (D.D.C. 2021) (internal citations and quotation marks omitted). "The burden then shifts to the non-moving party to raise a genuine issue of material fact as to the making of the agreement, using evidence comparable to that identified in Rule 56." *Id.* (internal citations and quotation marks omitted).  "The court must grant summary judgment with respect to the formation of an arbitration agreement if the pleadings and evidence show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Id.* (internal citations and quotation marks omitted).  But if the Court concludes that a "genuine dispute of material fact exists as to the making of the arbitration agreement, including whether the parties assented to the agreement," the case must "proceed summarily to trial solely on the issue of arbitrability." *Jin*, 966 F.3d at 827 (internal quotations omitted).

### III.  ANALYSIS

The present dispute between the parties is narrow one.  Plaintiff does not dispute that he clicked on the button stating "I understand and agree to Lyft's Terms of Service and Privacy Policy"; that the 2016 Terms of Service include an arbitration clause and that his claims fall within the scope of that clause; and that the 2016 Terms of Service were in effect at the time he suffered his injuries and that the agreement, if any, survived the termination of his relationship with Lyft.  Plaintiff, instead, seeks to avoid arbitration on two grounds.  First, although he

concedes that the 2016 Terms of Service are otherwise "enforceable," he maintains that this agreement did "not form an enforceable agreement to arbitrate."  Dkt. 25 at 3 (upper case changed to lower case).  Second, he maintains that the 2021 Terms of Service do not apply retroactively to his claims, which accrued almost a year before the updated Terms of Service took effect.  *Id.* at 6.  The Court need resolve only the first issue, which is dispositive of the parties' obligation to arbitrate:  Plaintiff "agreed to arbitrate his claims against [Lyft] because he had reasonable notice of the [2016] Terms of Service and the arbitration clause therein" and accepted that condition, *Selden*, 4 F.4th at 155, and nothing occurring after Plaintiff and Lyft agreed to arbitrate claims rescinded that agreement.

## A.      The Federal Arbitration Act

"Section 2 of the Federal Arbitration Act (FAA) makes agreements to arbitrate 'valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'"  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 336 (2011) (quoting 9 U.S.C. § 2).  The FAA "reflec[s] both a liberal federal policy favoring arbitration, and the fundamental principle that arbitration is a matter of contract," and so "courts must place arbitration agreements on equal footing with other contracts, and enforce them according to their terms."  *Id.* at 339 (internal citations and quotation marks omitted).

Plaintiff does not dispute that the FAA governs the arbitration agreement contained in Lyft's Terms of Service.  *See* Dkt. 28 at 5 n.2; *see also* Dkt. 17-4 at 17 ("This Agreement to arbitrate . . . is governed by the Federal Arbitration Act").  The FAA applies to "written provision[s] in any . . . contract evidencing a transaction involving commerce," 9 U.S.C. § 2, which includes "commerce . . . in the District of Columbia . . . or between the District of Columbia and any State or Territory or foreign nation," *id.* § 1.  Plaintiff alleges that he rented

the Lyft scooter in the District of Columbia, Dkt. 1-1 at 11–12 (Compl. ¶¶ 10–11, 14), which is sufficient to establish a transaction involving commerce under the FAA, *see Ruiz v. Millennium Square Residential Ass'n*, 156 F. Supp. 3d 176, 180 (D.D.C. 2016).  The Court must, accordingly, "'rigorously' . . . 'enforce [the] arbitration agreement[,]'" if one exists, "according to [its] terms.'" *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018) (quoting *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013)).

**B.      Whether There Is an Enforceable Agreement to Arbitrate.**

"Because arbitration is a contractual matter," the Court must "first determine whether the parties have agreed to arbitrate by looking to state contract law."  *Selden*, 4 F.4th at 156; *see also Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019) ("[B]efore referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists."); *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) ("When deciding whether the parties agreed to arbitrate a certain matter . . . courts generally . . . should apply ordinary state-law principles that govern the formation of contracts."); *Osvcatics*, 535 F. Supp. 3d at 10 (similar); *Schwab v. MissionSide, LLC*, No. CV 20-2376, 2021 WL 5138445, at *4 (D.D.C. Nov. 4, 2021) (similar).  Plaintiff maintains that the Court should look to the law of "the District of Columbia" to determine "whether the parties entered into a valid and binding arbitration agreement," Dkt. 25 at 3, while the 2016 Terms of Service provide that the agreement "shall be governed by the laws of the State of California[,] without regard to choice of law principles," Dkt. 17-3 at 20.  The D.C. and California law requirements for formation of a binding contract, however, do not differ in material respects.

In *Selden v. Airbnb*, the D.C. Circuit considered a case much like this one.  There, "[w]hen Gregory Selden signed up for Airbnb, he was presented with a sign-in wrap—a

10

webpage that informs the user he is agreeing to certain terms by signing up." 4 F.4th at 152. Unlike in this case, the "sign-up screen" did not require the user to click on a box indicating agreement, but rather stated: "By signing up, I agree to Airbnb's Terms of Service, Privacy Policy, Guest Refund Policy, and Host Guarantee Terms." *Id.* at 152–53. The references to each of those documents appeared in red and included a hyperlink to the relevant document. *Id.* at 153. Airbnb's Terms of Service, in turn, "included a clause requiring that all disputes be resolved by arbitration." *Id.* at 152.

"On appeal, Selden argue[d] that he did not agree to arbitrate because Airbnb's sign-up screen failed to put him on notice of the arbitration clause in its Terms of Service." *Id.* at 152. The D.C. Circuit rejected that argument. *Id.* at 155. Applying California contract law, the court considered whether, even if Selden "lacked actual notice of the terms," he could "be bound if he manifested his consent and 'a reasonably prudent user would have been on inquiry notice of the terms.'" *Id.* at 156 (cleaned up) (quoting *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74-75 (2d Cir. 2017). The court explained that "[t]o determine whether a sign-up wrap provides reasonable notice of the terms to which the user is agreeing," courts should to "look to the layout and language of the site' to decide whether it would provide a 'reasonably prudent smartphone user' with 'reasonable notice that a click'—i.e., signing up—'will manifest assent to an agreement,'" *id.* at 156 (quoting *Meyer*, 868 F.3d at 75, 77). In that case, the Court concluded that the sign-in screen's "simple design" with the "terms and policies appear[ing] in red text against a white background" with hyperlinks "placed Seldon on reasonable notice that by signing up he agreed to the Terms of Service." *Id.* at 156. The court further explained, "[w]hether Selden read those Terms [wa]s irrelevant because he was on inquiry notice." *Id.* at 157.

In all respects, this case is on all fours with *Selden*.  Here, as in *Selden*, the user was presented with a sign-up page that provided "reasonable notice that a click [would] manifest assent to an agreement."  *Id.* at 156.  Here, as in *Selden*, that notice included a bold colored hyperlink—in bright pink in this case—to the relevant terms and conditions.  *Id.*  Here, as in *Selden*, "the sign-in appeared on a single screen for a [smartphone] user . . . and required no scrolling to see the notice of the Terms of Service."  *Id*. at 156–57.  And, here, as in *Selden*, "the notice was 'clearly legible, appropriately sized, and unobscured by other visual elements."  *Id.* at 157.  Indeed, if anything, this case presents clearer evidence of the user's assent than occurred in *Selden*.  Here, unlike in *Selden*, the user was required to click on a box next to the phrase "I understand and agree to Lyft's Terms of Service and Privacy Policy," expressly and directly manifest his agreement.  Under these circumstances, "[a]ny reasonable smartphone user would understand that" by clicking on that box and then clicking on "Next," he was agreeing to those terms.  *Id.*

Nor does California law, which the D.C. Circuit applied in *Selden*, and D.C. law, which Plaintiff argues applies here, differ in any material respect.  As the D.C. Circuit explained in *Selden*, the question "[w]hether mutual consent exists 'is determined by objective rather than subjective criteria, the test being what outward manifestations of consent would leave a reasonable person to believe.'"  *Id.* at 156 (quoting *Monster Energy Co. v. Schechter*, 249 Cal. Rptr.3d 295, 301 (2019)).  "Even if an offeree lacked actual notice of the terms," moreover, "he may be bound if he manifested his consent and 'a reasonably prudent user would [have] be[en] on inquiry notice of the terms.'"  *Id*. at 156 (quoting *Meyer v. Uber Techs., Inc*., 868 F.3d 66, 74-75 (2d Cir. 2017)).  The same is true under D.C. law, which also requires mutual consent to create an enforceable contract, *Eastbanc, Inc. v. Georgetown Park Assocs. II, L.P.*, 940 A.2d

996, 1003–04 (D.C. 2008), and mandates that, "absent fraud or mistake, one who signs a contract is bound by a contract which he has an opportunity to read whether he does so or not," *Forrest v. Verizon Commc'ns, Inc.*, 805 A.2d 1007, 1010 (D.C. 2002) (internal citation and quotation marks omitted); *see also Proulx v. 1400 Pennsylvania Ave., SE, LLC*, 199 A.3d 667, 672 (D.C. 2019).

In *Forrest*, the D.C. Court of Appeals considered the enforceability of a forum selection clause in Verizon's Internet Services Access Agreement.  805 A.2d at 1009-10.  The court first had to address "whether the existence of the clause was reasonably communicated to the plaintiff."  *Id.* at 1010 (internal citation and quotation marks omitted).  The Agreement was presented "in a scroll box on [users'] computer monitors, where only a small portion of the document [wa]s visible at any one time," and where "[t]he contract [wa]s entered into by the subscriber clicking an 'Accept' button."  *Id.*  Users had to agree to the terms to subscribe.  *Id.* The court held that the "appellant was provided adequate notice of the forum selection clause," relying on the "general rule" that "one who signs a contract is bound by" it, regardless whether he reads it.  *Id.* (internal citation and quotation marks omitted).  Like the plaintiffs in *Seldon* and *Forrest*, Plaintiff is bound by an electronic agreement reasonably communicated to him, regardless of whether he actually read it.

Numerous other judicial decisions have concluded that clickwrap and similar electronic agreements are enforceable.[3]  Most notably, in another case involving Lyft, then-Judge Jackson explained that "Lyft's method of obtaining drivers' assent to its Terms of Service—presenting

---

[3] *See, e.g.*, *DeJohn v. The .TV Corp. Int'l*, 245 F. Supp. 2d 913, 919 (N.D. Ill. 2003) (explaining that "failure to read a contract is not a get out of jail free card," and that the "same rule applies to electronic contracts"); *Koresko v. RealNetworks, Inc.*, 291 F. Supp. 2d 1157, 1162–63 (E.D. Cal. 2003) ("When Plaintiff clicked the click-box on the screen marked, 'I agree' on Defendant's website, he expressly agreed to litigate any claims . . . exclusively in the State of Washington."); *i.Lan Sys., Inc. v. Netscout Serv. Level Corp.*, 183 F. Supp. 2d 328, 338 (D. Mass. 2002) (enforcing a "clickwap license agreement").

13

the terms of the agreement and requiring users to click 'I agree' before they can access the service—constitutes a valid means of offer and acceptance." *Osvatics*, 535 F. Supp. 3d at 11 (citations omitted).  The Court accordingly rejects Gambo's argument that the arbitration provision is unenforceable because he was not on reasonable notice of it.

Because Plaintiff does not otherwise dispute that his claims are subject to arbitration, that resolves the matter, and the Court need not reach Lyft's arguments regarding its 2021 Terms of Service.

**C.      Remedy**

Finally, the Court must decide whether to dismiss Plaintiff's claims against Lyft or whether, instead, to stay proceedings with respect to those claims.  "There is presently a circuit split on the question whether, when a motion to compel arbitration is granted, the case should be stayed pending the resolution of arbitration or rather dismissed in favor of arbitration." *Sakyi v. Estée Lauder Companies, Inc.*, 308 F. Supp. 3d 366, 387 & n.9 (D.D.C. 2018); *L. Firm of LarJack, PLLC v. Citibank, N.A.*, No. CV 21-1592, 2021 WL 4192030, at *6 (D.D.C. Sept. 15, 2021).  Section 3 of the FAA provides that courts "shall on application of one of the parties *stay* the trial of the action until such arbitration has been had." 9 U.S.C. § 3 (emphasis added).  "The circuits are split, however, on whether § 3 mandates a stay or if it permits a court to dismiss a lawsuit when all of the claims before it are subject to an arbitration agreement." *L. Firm of LarJack, PLLC*, 2021 WL 4192030, at *6 (emphasis omitted).

Here, the Court concludes that there is no reason to dismiss Plaintiff's claims at this time.  As the First Circuit has observed, the principal difference between staying a case pending arbitration and dismissing the case is that "[a]n order compelling arbitration and staying the action isn't immediately appealable," while "an order compelling arbitration and dismissing the

action is." *Johnmohammadi v. Bloomingdale's, Inc*., 755 F.3d 1072, 1074 (1st Cir. 2014) (internal citations omitted).  In this case, however, that distinction does not make a difference. Even if the Court were to dismiss Plaintiff's claims against Lyft, that decision would not be subject to immediate appeal because other claims remain pending against Segway, Inc., Segway Robotics, Inc., and Ninebot, Inc.  *See* Fed. R. Civ. P. 54(b) ("any order or other decision . . . that adjudicates fewer than all the claims or rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties").  Although courts may, at times, enter partial final judgment pursuant to Rule 54(b), no one asked the Court to do so in this case, nor can the Court discern a basis for doing so.

The Court will, accordingly, stay all claims against Lyft pending further order of the Court.

## CONCLUSION

For the foregoing reasons, Lyft, Inc. and Lyft Bikes and Scooters, LLC's Motion to Compel Arbitration and to Dismiss or Stay is **GRANTED**; the parties are hereby **COMPELLED** to submit Plaintiff's claims against Lyft, Inc. and Lyft Bikes and Scooters, LLC to binding arbitration consistent with the FAA; and all of Plaintiff's claims against Lyft, Inc. and Lyft Bikes and Scooters LLC are hereby **STAYED** pending further order of the Court.

**SO ORDERED**.


/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge


Date:  November 15, 2022

15